ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2006 NOV 20   PM 3: 38

CLERK OF COURT

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **GALDERMA LABORATORIES, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **4 - 0 6 C V - 8 2 2 - Y** |
| **vs.** | § | CIVIL ACTION NO. _____ |
| | § | |
| **DIMENSIONAL HEALTHCARE, INC.,** | § | |
| **MICHAEL J. MORALES and** | § | |
| **AQUENT, INC.** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

GALDERMA LABORATORIES, L.P. ("Galderma") files this Plaintiff's Original

Complaint, and in support thereof, states:

### I.
### PARTIES

1.     Galderma is a Texas Limited Partnership with its principal place of business in

Denton County, Texas.  Galderma General, LLC, a Delaware LLC with its principal place of

business in Texas, is the general partner of Galderma Laboratories, L.P.  Galderma Limited,

LLC, a Delaware LLC with its principal place of business in Delaware, is the sole limited partner

of Galderma Laboratories, L.P.

2.     Dimensional Healthcare, Inc. ("Dimensional") is a New Jersey Corporation with

its principal place of business located at 240 Cedar Knolls Road, Suite 101, Cedar Knolls, New

Jersey 07927.  Dimensional may be served through its registered agent for service of process,

Thomas Wichowski, at 105 Daniel Avenue, Rutherford, New Jersey 07070.  Dimensional may

also be served through its Chief Executive Officer, Michael J. Morales, at 46 Canterbury Road, Denville, New Jersey 07834, or where found.

3.      Michael J. Morales ("Morales") is an individual who resides in Morris County, New Jersey.  He may be served at his home address at 46 Canterbury Road, Denville, New Jersey 07834, or where found.

4.      Aquent, Inc. ("Aquent") is a Massachusetts corporation with its principal place of business in Massachusetts.  Aquent may be served through its registered agent for service of process, Andrea Neisig, at 1509 Main Street, Suite 1000, Dallas, Texas 75201.

## II.
## VENUE AND JURISDICTION

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it involves citizens of different states, and the damages suffered by Plaintiff exceed $75,000.00 exclusive of interest and costs.

6.      Dimensional, Morales and Aquent (collectively, "Defendants") have had substantial, continuous and systematic contacts with Texas and have purposefully availed themselves of the benefits and protections of Texas by establishing minimum contacts with Texas.  Additionally, Defendants have created continuing relationships and obligations with citizens of Texas and have contracted in Texas.  This court has personal jurisdiction over Defendants because the causes of action asserted herein relate to, and arise from, those contacts. The Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

7.      Venue is proper in this district and division pursuant to 28 U.S.C. §1391(a) because, as provided below, a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## III.
## FACTUAL ALLEGATIONS

8.      Galderma is a specialty pharmaceutical company that develops and produces a number of products to treat skin conditions.  As part of its product development, Galderma contracts with companies to manage clinical trials on its behalf.

9.      On or about February 20, 2004, Dimensional and Galderma entered into a Master Services Agreement (the "Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit "A".  The purpose of the Agreement was to establish the general terms and conditions under which Dimensional would manage and monitor various clinical trials on behalf of Galderma.  Morales is the President and sole owner of Dimensional.

10.     In Section 2.1 of the Agreement, Galderma promised to "reimburse [Dimensional] for all reasonable and necessary expenses and pass-through costs, net of discounts, incurred in the performance of the Services [as defined in the Agreement] subject to any amount limitation set forth in the Work Order [as defined in the Agreement]."  Section 2.2 of the Agreement further provided that Dimensional was to "invoice Galderma monthly for the fees, expenses and pass-through costs relating to the Project [as defined in the Agreement]."  Sections 2.1 and 2.2 of the Agreement reflect the understanding of the parties that, while managing and overseeing clinical trials on behalf of Galderma, Dimensional would incur costs from service providers and other creditors, and that upon Dimensional's promise and representation that it had paid such costs, Galderma would reimburse Dimensional.

11.     Pursuant to the foregoing provisions of the Agreement, Dimensional, in the course of various clinical trials conducted on Galderma's behalf in accordance with the Agreement, invoiced Galderma for reimbursement of payments that Dimensional had made to

third parties.  By submitting such invoices to Galderma, Dimensional represented to Galderma that the relevant third-party costs incurred by Dimensional in performing Services under the Agreement had, in fact, been paid.  In reliance on such representations, Galderma promptly paid Dimensional for these invoices.

12.     Galderma has discovered that, contrary to Dimensional's representations, Dimensional failed to pay a significant number of third-party costs incurred by Dimensional, for which Dimensional received reimbursement from Galderma.  Indeed, Dimensional and Morales have openly acknowledged that many of the third-party costs for which Dimensional has billed Galderma have not actually been paid, and that Dimensional misrepresented the fact that such third-party costs had been paid.

13.     Section 6.0 of the Agreement states that "[a]t Galderma's request, Dimensional will promptly prepare and submit to Galderma a financial report, including but not limited to financial records relating to a particular Work Order [as defined in the Agreement] or its performance.  In the event that Dimensional fails to deliver to Galderma any of the information requested, upon reasonable notice to Dimensional, Galderma may review such records at Dimensional's premises during Dimensional's normal business hours, and upon request, obtain copies of such records concerning any invoices or deliverables that are in dispute."

14.     During the week of November 6, 2006, Galderma exercised its rights under Section 6.0 of the Agreement to inspect and audit Dimensional's books and records.  The preliminary results of such inspection have confirmed that Dimensional has not paid well over $1,000,000.00 in third-party costs incurred by Dimensional under the Agreement, for which Defendants sought, and Galderma paid, reimbursement.

15.     Galderma also pre-paid Dimensional a substantial sum for several projects that were later cancelled or substantially reduced.   Dimensional represented to Galderma on numerous occasions over the past eight months that such pre-payments would be refunded.   In reliance on such representations, Galderma continued to utilize Dimensional's services and to pay Dimensional's invoices.   Nevertheless, Dimensional has altogether failed and refused to reimburse Galderma for any of the foregoing pre-payments.

16.     Aquent is a financing company that purchases account receivables from businesses at a discounted rate.   On information and belief, in October 2006, Aquent purchased some or all of Dimensional's account receivables.   Included in the accounts receivable purchased by Aquent are certain accounts listed on Dimensional's books as receivables due from Galderma.   Aquent has attempted to collect such accounts from Galderma, apparently unaware of the dubious nature of Dimensional's conduct and the significant claims and defenses that Galderma has against Dimensional, as set forth more herein.   In particular, all or part of the accounts receivable now held by Aquent for which it seeks from Galderma consist of requests for reimbursement of third-party costs, which Dimensional has not paid itself.   Galderma has no obligation under the Agreement to reimburse Dimensional for those amounts unless and until Dimensional pays such third-party costs itself.

17.     On information and belief, Dimensional has recently substantially or completely ceased its operations and completely abrogated all of its obligations under the Agreement.

## IV.
## CLAIMS FOR RELIEF

### COUNT ONE - BREACH OF CONTRACT

18.     Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

19.    The Agreement constitutes a valid, enforceable contract between Galderma and Dimensional, whereby Dimensional promised to pay third-party costs incurred while conducting clinical studies on behalf of Galderma, and Galderma promised to reimburse Dimensional for such payments to third parties.

20.    Galderma performed its obligations under the Agreement.

21.    Dimensional absolutely repudiated and breached its obligations under the Agreement when it failed to pay the third-party costs incurred while conducting clinical studies on behalf of Galderma, all while accepting payment from Galderma for reimbursement of those third-party costs.

22.    Dimensional breached and repudiated these obligations without just excuse.

23.    Dimensional's breach of contract and repudiation has caused damages to Galderma in excess of $1,000,000.00.

## COUNT TWO – QUANTUM MERUIT/UNJUST ENRICHMENT

24.    Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

25.    Pleading further and in the alternative, Galderma seeks recovery from Dimensional under the doctrines of quantum meruit and unjust enrichment.

26.    Dimensional sought, received and accepted payment from Galderma as reimbursement for payments that Dimensional never made to third parties.

27.    Dimensional had reasonable notice that Galderma expected Dimensional to, at a minimum, use the reimbursement funds to pay costs that Dimensional incurred while conducting clinical trials on behalf of Galderma.

28.　Dimensional will be unjustly enriched in an amount in excess of the jurisdictional limits of this Court if allowed to retain the benefit of Galderma's payments without paying the third parties or returning the money to Galderma.

29.　Dimensional's unjust enrichment has caused damages to Galderma in excess of $1,000,000.00.

## COUNT THREE – NEGLIGENT MISREPRESENTATION

30.　Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

31.　Throughout Dimensional's business relationship with Galderma, Dimensional repeatedly promised and represented to Galderma that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid.  Indeed, every time that Dimensional delivered an invoice to Galderma which included a request for reimbursement of third-party costs incurred by Dimensional while conducting clinical trials on behalf of Galderma under the terms of the Agreement, Dimensional represented to Galderma that such third-party costs had been paid.  Over the course of 2006, Dimensional sent Galderma several invoices that contained such representations.

32.　Dimensional's promises and representations that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid, including those reflected in invoices from Dimensional to Galderma, were false.

33.　Dimensional failed to exercise reasonable care or competence in obtaining or communicating this information to Galderma.

34.     Galderma justifiably relied on Dimensional's promises and representations that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid.

35.     As a direct result of Dimensional's negligent misrepresentations, Galderma has been damaged and is entitled to recover from Dimensional damages in excess of $1,000,000.00.

## COUNT FOUR – FRAUD

36.     Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

37.     Throughout Dimensional's business relationship with Galderma, Dimensional repeatedly promised and represented to Galderma that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid.  Indeed, every time that Dimensional delivered an invoice to Galderma which included a request for reimbursement of third-party costs incurred by Dimensional while conducting clinical trials on behalf of Galderma under the terms of the Agreement, Dimensional represented to Galderma that such third-party costs had been paid.  Over the course of 2006, Dimensional sent Galderma several invoices that contained such representations.

38.     Dimensional's promises and representations that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid Dimensional's promises and representations that the costs Dimensional incurred from service providers and other third parties while conducting clinical trials on behalf of Galderma had been paid, including those reflected in invoices from Dimensional to Galderma, were false and material.

39.    Dimensional was aware of the falsity of its promises and representations and understood them to be false at the time the promises and representations were made.

40.    Dimensional intended, or had reason to expect, that Galderma would act in reliance of the false promises and misrepresentations made by Dimensional to Galderma.

41.    Galderma justifiably relied on Dimensional's assurances and reimbursed Dimensional for funds that were purportedly paid to the third parties.

42.    As a result of Dimensional's false promises and misrepresentations, Galderma has been damaged and is entitled to recover from Dimensional damages in excess of $1,000,000.00.

## COUNT FIVE – DECLARATORY JUDGMENT

43.    Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

44.    Galderma brings this claim for declaratory judgment against Dimensional and Aquent under both Fed. R. Civ. P. 57 and 28 U.S.C. § 2201-2202.

45.    Aquent, as the purported successor-in-interest to Dimensional, has attempted to collect from Galderma invoices for reimbursement of third-party costs incurred by Dimensional while conducting clinical trials on behalf of Galderma under the terms of the Agreement, despite the fact that such third-party costs were never actually paid by Dimensional.  Under the terms of the Agreement, Galderma has no obligation to reimburse Dimensional for such third-party costs until Dimensional first pays such costs itself.  Aquent is quite simply attempting to collect reimbursement from Galderma for money that Dimensional never paid.

46.    As a result, an actual and justiciable controversy exists with respect to Dimensional's failure to pay third-parties under the Agreement and Aquent's subsequent attempts to collect on Dimensional's fraudulent invoices.  Galderma asks this Court to construe

the Agreement, along with the terms and conditions incorporated therein, and declare that (1) neither Aquent nor Dimensional has any right to collect any money from Galderma on account of Dimensional's fraudulent invoices; (2) Dimensional's material breach of the Agreement relieves Galderma from its obligations under the Agreement to make any further payments to Dimensional or Aquent; and (3) Galderma's damages recoverable against Dimensional for the claims stated herein, which are far in excess of any claim Dimensional or Aquent might have against Galderma, fully and completely offset any claim for collection of accounts receivable that might be asserted by Dimensional or Aquent.

## V.
## ATTORNEY'S FEES

47.     Each of the preceding factual allegations is incorporated herein, the same as if fully set forth at length.

48.     Because of the conduct described herein, Galderma retained the law firm of Haynes and Boone, LLP to represent it in this action.  Galderma has agreed and has become obligated to pay the fees and expenses of Haynes and Boone, LLP as charged.

49.     As provided by Chapter 38 of the Texas Civil Practice and Remedies Code and the laws of the State of Texas, as well as 28 U.S.C. § 2202, Galderma is entitled to recover its reasonable attorney's fees and litigation expenses incurred in connection with this action, as well as all costs of court.  TEX. CIV. PRAC. & REM. CODE § 38.001, *et seq.*

## VI.
## CONDITIONS PRECEDENT

50.     Galderma pleads that all of the conditions precedent to recovery have been performed or have occurred.

## VII.
## ALTER EGO

51.     Galderma pleads that Morales, as the sole shareholder, a director and officer of Dimensional, so dominated Dimensional that the corporation ceased to have a separate existence and served as Morales' alter ego.

52.     Galderma further pleads that Morales, as the sole shareholder, director and officer of Dimensional, used the corporate entity of Dimensional to perpetrate a fraud against Galderma.

53.     Morales' domination of Dimensional and use of the corporation to perpetrate a fraud against Galderma require that the corporate form of Dimensional be disregarded and individual liability be imposed against Morales for the debts and acts of Dimensional.

54.     Piercing the corporate veil of Dimensional in this case is necessary to prevent fraud and to achieve equitable results.

## VIII.
## PRAYER

WHEREFORE, Galderma requests that Defendants be cited to appear and answer herein, and that on final hearing, Galderma have judgment as follows:

1.     A declaratory judgment against Dimensional and Aquent that (a) neither Aquent nor Dimensional has any right to collect any money from Galderma on account of Dimensional's fraudulent invoices; (b) Dimensional's material breach of the Agreement relieves Galderma from its obligations under the Agreement to make any further payments to Dimensional or Aquent; and (c) Galderma's damages recoverable against Dimensional for the claims stated herein, which are far in excess of any claim Dimensional or Aquent might have against Galderma, fully and completely offset any claim for collection of accounts receivable that might be asserted by Dimensional or Aquent.

2.     A judgment for actual damages against Dimensional and Morales  in excess of $1,000,000.00;

3.     A judgment for punitive damages to the extent permitted by law;

4.     A judgment for pre-judgment interest to the extent permitted by law;

5.      A judgment for post-judgment interest at the maximum rate allowed by law;

6.      A judgment for Attorney's fees and expenses;

7.      A judgment for all costs of court; and

8.      Such other and further relief, both at law or in equity, to which Galderma may show itself justly entitled.


Respectfully submitted,


Stephen M. Pezanosky
State Bar No. 15881850
Josh Borsellino
State Bar No. 24045532

HAYNES AND BOONE, LLP
201 Main Street, Suite 2200
Fort Worth, Texas 76102
Telephone:    (817) 347-6600
Telecopier:   (817) 347-6650

ATTORNEYS FOR GALDERMA
LABORATORIES, L.P.

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Master Agreement") is made by and between Galderma Laboratories, L.P., having a place of business at 14501 N. Freeway, Fort Worth, Texas 76177 (hereinafter "GALDERMA") and Dimensional HealthCare, Inc., having a place of business at 240 Cedar Knolls Road, Suite 101, Cedar Knolls, New Jersey 07927 (hereinafter "DHC").

**WHEREAS,** GALDERMA and DHC desire to enter into this Master Agreement, to provide the terms and conditions upon which GALDERMA may engage DHC from time-to-time to provide services or projects by executing individual Work Orders (as defined below) specifying the details of the services and the related terms and conditions.

**THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party hereto to the other, GALDERMA and DHC agree that:

**1.0     Scope of the Master Agreement; Work Orders; Nature of Services.**

1.1     <u>Scope of Agreement</u>. As a "master" form of contract, this Master Agreement allows the parties to contract for multiple projects through the issuance of multiple Work Orders (as discussed in subsection 1.2 below) without having to re-negotiate the basic terms and conditions contained herein.

1.2     <u>Work Orders</u>. The specific details of each project or study under this Master Agreement (each "Project") shall be separately negotiated and specified in writing on terms and in a form acceptable to the parties (see attached <u>Exhibit A</u>). Each Work Order will include, as appropriate, the Project description or Project protocol, scope of work, time line, budget and payment schedule. Each Work Order shall incorporate this Master Agreement by reference. This Master Agreement and such Work Order shall collectively, independent from other Work Orders, constitute the entire agreement for a Project. To the extent any terms or provisions of a Work Order conflict with the terms and provisions of this Master Agreement, the terms and provisions of this Master Agreement shall control, except to the extent that the applicable Work Order expressly and specifically states an intent to supersede the Master Agreement on a specific matter. Notwithstanding the foregoing, GALDERMA is not obligated to execute any Work Orders hereunder, and DHC shall not rely on this Master Agreement to incur any costs or obligations of any sort.

1.3     <u>Nature of Services</u>. The services covered by this Master Agreement relate to clinical evaluation through commercialization of product, which includes but is not limited to, strategic planning, expert consultation, project management, clinical monitoring, other clinical trial services, statistical programming and analysis, data management, regulatory, quality assurance and auditing, and other research and development services requested by GALDERMA and agreed to by DHC as set forth in the relevant Work Order (collectively, the "Services").

1.4     Notwithstanding any other provision of this Master Agreement, and in addition to any other specific responsibilities of DHC which are set forth herein, pursuant to 21 CFR § 312.52, GALDERMA may, from time to time, transfer and DHC will assume all or some of the specific obligations of GALDERMA as "Sponsor" under the Federal Food and Drug Administration Act ("Act"). A description of such obligations which may be transferred to DHC is provided in the Work Orders to this Master Agreement.

1

PENGAD 800-631-6989

**EXHIBIT**

*A*

**2.0**   **Payment of Fees and Expenses.**   No billings or payments shall be made under this Master Agreement.   GALDERMA will pay DHC for fees, expenses and pass-through costs in accordance with each Work Order.   Unless otherwise agreed to in a particular Work Order, the following shall apply:

   2.1   GALDERMA shall reimburse DHC for all reasonable and necessary expenses and pass-through costs, net of discounts, incurred in the performance of the Services subject to any amount limitation set forth in the Work Order;

   2.2   DHC will invoice GALDERMA monthly for the fees, expenses and pass-through costs relating to the Project.   Invoices are to be sent directly to Leticia Cole, Galderma Laboratories, L.P., 14501 North Freeway, Ft. Worth, TX 76177;

   2.3   DHC will invoice GALDERMA promptly upon achievement of agreed to milestones (if other than monthly) for payment of Services;

   2.4   GALDERMA shall pay each invoice within thirty (30) days of receipt of Invoice;

   2.5   In the event any Work Order or this Master Agreement is terminated in accordance with Section 16.0 below, payment and/or reimbursement of fees and costs shall be made in accordance with subsection 16.4(b); and

   2.6   If any portion of an invoice is disputed, then GALDERMA shall pay the undisputed amounts as set forth in subsection 2.4 above and the parties shall use good faith efforts to reconcile the disputed amount as soon as practicable.

**3.0**   **Term.**   This Master Agreement shall commence on January 1, 2004 and shall continue for a period of five (5) years unless sooner terminated in accordance with Section 16.0 below.

**4.0**   **Change Orders.**   Any material change in the details of a Work Order shall require a written amendment to the Work Order (a "Change Order", an example of which is attached hereto as Exhibit B).   Each Change Order shall detail the requested changes to the applicable task, responsibility, duty, budget, time line or other matters that will become effective upon the execution of the Change Order by both parties and DHC will be given a reasonable period of time within which to implement the changes.   Both parties agree to act in good faith and promptly when considering a Change Order requested by the other party.   DHC shall not implement any change in the Project's scope without GALDERMA's prior approval.   DHC reserves the right to postpone effecting material changes in the Project's scope until such time as the parties agree to and execute the corresponding Change Order.

**5.0**   **Personnel.**   The Services with respect to each Project shall be performed by DHC under the direction of the person identified as the Project Manager in the applicable Work Order or such other person(s) acceptable to GALDERMA as DHC may from time to time designate, such acceptance by GALDERMA shall not to be unreasonably withheld.   GALDERMA retains the right to request that such designated person(s) be removed and replaced with a new Project Manager or person(s), and DHC shall make best efforts to honor such request.

   DHC shall be obligated at all times to provide a sufficient number of trained personnel qualified by education, training, and experience in connection with a given Work Order to meet the demands of said Work Order.

2

DHC shall not subcontract or assign any Services under a Work Order to any third party without the prior written consent of GALDERMA, such consent not to be unreasonably withheld.

6.0 **Financial Disclosure.** At GALDERMA's request, DHC will promptly prepare and submit to GALDERMA a financial report, including but not limited to financial records relating to a particular Work Order or its performance. In the event that DHC fails to deliver to GALDERMA any of the information requested, upon reasonable notice to DHC, GALDERMA may review such records at DHC's premises during DHC's normal business hours, and upon request, obtain copies of such records concerning any invoices or deliverables that are in dispute.

7.0 **Confidentiality.** It is understood that during the term of this Master Agreement, DHC and its employees, consultants, subcontractors, agents, and persons under contract or associated with DHC may be exposed to or may generate, develop or gather data and information which is confidential and proprietary to GALDERMA. All such data and information (hereinafter "GALDERMA Confidential Information") whether written or verbal, tangible or intangible, made available, disclosed, or otherwise made known to DHC and its employees, consultants, subcontractors, agents, and persons under contract or associated with DHC as a result of Services under this Master Agreement shall be considered proprietary and confidential and shall be considered the sole property of GALDERMA. All information regarding DHC's pricing and any programming code disclosed by DHC to GALDERMA in connection with this Master Agreement is proprietary and confidential information belonging to DHC (hereinafter "DHC Confidential Information", and together with GALDERMA Confidential Information, the "Confidential Information"). Both parties agree not to reveal, publish or otherwise disclose the Confidential Information of the other party to any third party without the prior written consent of the disclosing party. DHC shall not engage any third person for any work under the scope of this Master Agreement without the prior written consent of GALDERMA. In the event DHC desires to engage any other person, DHC shall submit to GALDERMA the name of such person. If such person is approved by GALDERMA, GALDERMA shall, at such time, require such person to sign an agreement defining its/his/her obligations with respect to GALDERMA Confidential Information and the other matters set forth in this Master Agreement in the form attached hereto as Exhibit C. DHC shall ensure that any and all of its employees, consultants, subcontractors, agents, and persons under contract or associated with DHC as a result of Services under this Master Agreement observe these obligations of confidentiality. These obligations of confidentiality and nondisclosure shall remain in effect for a period of ten (10) years after the termination or expiration of the applicable Work Order.

The foregoing obligations shall not apply to Confidential Information to the extent that it: (a) is or becomes generally available to the public other than as a result of a disclosure by the receiving party; (b) becomes available to the receiving party on a non-confidential basis from a source which is not prohibited from disclosing such Confidential Information; (c) was developed independently of any disclosure by the disclosing party or was known to the receiving party prior to its receipt from the disclosing party as shown by contemporaneous written evidence; or (d) is required by law, regulation, or other act of governmental authority to be disclosed; provided, however, that if such disclosure is required, the receiving party will notify the disclosing party promptly of the required disclosure, and shall use reasonable efforts to minimize the extent of and obtain confidential treatment of Confidential Information required to be disclosed, if available. All Confidential Information containing personal data shall be handled in accordance with all applicable laws.

3

DHC agrees to provide statistical programming code, exclusive of proprietary software code, at the request of GALDERMA or as outlined in a Work Order and will provide the analysis-ready SAS® data sets used to generate the trial summaries, listings, figures, and analyses. Additionally, DHC will provide SAS® statistical procedure code and associated statistical procedure so that GALDERMA can confirm that the appropriate statistical procedures and models have been used for the trial statistical analyses.

**8.0   Ownership and Inventions.** All data, information, reports, results and other work product generated or derived by DHC, its employees, contractors, consultants, agents, and persons under contract or associated with DHC, during the course of or as a result of the Services performed by DHC under a Work Order pursuant to this Master Agreement shall be and remain the sole and exclusive property of GALDERMA, and shall be treated as GALDERMA Confidential Information. All information and data collected, generated, or prepared during a Project carried out under this Master Agreement, and all discoveries, inventions, improvements, new uses, processes, techniques, and compounds, whether patentable or not, arising from work performed or the test articles or substances studied under this Master Agreement (collectively referred to hereinafter as "Inventions"), shall be the sole and exclusive property of GALDERMA with full right of ownership, title, and interest thereto and therein and shall be treated as GALDERMA Confidential Information.

DHC hereby agrees to unconditionally assign to GALDERMA any and all right, title and interest in and to any Inventions. DHC and its employees, contractors, consultants, agents and persons under contract or associated with DHC performing Services under a Work Order shall promptly disclose to GALDERMA any Inventions arising hereunder. DHC represents that each of its employees, contractors, consultants, agents, and persons under contract or associated with DHC have agreed to assign to GALDERMA all Inventions made by any such persons under this Master Agreement. DHC, and its employees, contractors, consultants, agents and persons under contract or associated with DHC performing Services under this Master Agreement shall fully cooperate with GALDERMA in obtaining and maintaining, at GALDERMA's sole cost and expense, any patent protection as may be available with respect to such Inventions, and shall execute all documents reasonably deemed necessary by GALDERMA for purposes of procuring and maintaining such patent protection, and all documents necessary for assigning Inventions to GALDERMA. All works authored by DHC, and its employees, contractors, consultants, agents, and persons under contract or associated with DHC performing Services under this Master Agreement shall be deemed "works for hire", whether published or unpublished, to the extent permitted by Federal Copyright Law. In the event any such copyrightable work is not considered a "work for hire", DHC hereby assigns all right, title and interest in such work and all underlying works, drafts, and derivative works, in all forms and mediums now known or hereafter developed, to GALDERMA. DHC represents that it has and will continue to have agreements with its directors, officers, employees, consultants, agents, and persons under contract or associated with DHC to effectuate the terms of this Section and shall enforce such agreements to provide GALDERMA with the benefits of this Section.

At the completion of a Project under a Work Order by DHC, all materials and all other data owned by GALDERMA, regardless of the method of storage or retrieval, shall either be (a) delivered to GALDERMA in such form as is then currently in the possession of DHC, or (b) retained by DHC for GALDERMA for a period of three (3) years, or (c) disposed of, at the direction and written request of GALDERMA, unless such materials are otherwise required to be stored or maintained by DHC as a matter of law or regulation. If DHC is required or requested to maintain and/or store such material for a period beyond three (3) years after the termination or expiration of the relevant Work Order, the parties shall mutually agree on DHC's compensation

4

therefore. In no event shall DHC dispose of any materials or data or other information obtained or generated by DHC in the course of providing the Services hereunder without first giving GALDERMA sixty (60) days prior written notice of its intent to dispose of same.

GALDERMA agrees that any improvement, alteration or enhancement to DHC's systems, software, applications, or processes (such software, applications, etc., described as DHC Confidential Information in Section 7 above) which are developed or implemented during the course of providing Services under a Work Order to this Master Agreement are and shall remain the confidential property of DHC and shall be treated as DHC Confidential Information, and shall not be used, duplicated or reproduced in any form by GALDERMA, except as may be necessary for the proper conduct of the Project for which it was developed, exclusive of proprietary software code, or as may be reasonably necessary for compliance with requests made by regulatory authorities.

**9.0    Independent Contractor Relationship.**  For the purpose of this Master Agreement, the parties hereto are independent contractors and nothing contained in this Master Agreement shall be construed to place them in the relationship of partners, principal and agent, employer/employee or joint venturers. DHC agrees that it shall have no power or right to bind or obligate GALDERMA, nor shall DHC hold itself out as having such authority.

DHC acknowledges that GALDERMA is not responsible for any employee benefits, pensions, worker's compensation, withholding, or employment-related taxes as to any DHC directors, employees, consultants, contractors, agents, or any third-party who perform Services on behalf of DHC under this Master Agreement.

**10.0    Compliance with Laws; Inspections.**  DHC agrees that its Services will be conducted in compliance with all applicable legal and regulatory requirements, including without limitation, any applicable requirements of the U.S. Food and Drug Administration and the U.S. Food, Drug and Cosmetic Act, as applicable. DHC represents that it and its employees, affiliates, and agents have never been 1) debarred or 2) convicted of a crime for which a person can be debarred, under Section 306(a) or 306(b) of the Generic Drug Enforcement Act of 1992 ("Section 306(a) or (b)"). DHC represents that it has never been and, to the best of its knowledge after due inquiry, none of its employees, affiliates, or agents has ever been 1) threatened to be debarred or 2) indicted for a crime or otherwise engaged in conduct for which a person can be debarred, under Section 306(a) or (b). DHC agrees that it will promptly notify GALDERMA in the event of any such debarment, conviction, threat, or indictment. The terms of the preceding sentence shall survive the termination or expiration of this Master Agreement. GALDERMA represents that it shall not request DHC to perform assignments or tasks which violate any applicable law or regulation. DHC shall notify GALDERMA promptly in writing of any FDA or other governmental inspection or inquiry concerning any Project to which DHC Services relate.

If any governmental or regulatory authority conducts or gives notice to DHC of its intent to conduct an inspection or audit at any site where Services under a Work Order are being provided or to take any other regulatory action with respect to any Services or Project provided under this Master Agreement, DHC will make best reasonable efforts to promptly notify GALDERMA prior to complying with such a demand or request. To the extent permitted by applicable laws, rules, regulations, and other acts of governmental authority, GALDERMA shall have the right to (i) be present during any such inspection or audit, (ii) assist in the manner in which DHC fulfills its obligations to permit inspection or audit by governmental entities in connection with any Work Order, and (iii) provide input to any response(s) DHC may give to the governmental or regulatory authority prior to its submission.

5

**11.0   Conflict of Agreements**.  DHC represents to GALDERMA that it is not a party to any agreement which would prevent it from fulfilling its obligations under this Master Agreement. During the term of this Master Agreement, DHC shall not enter into any agreement to provide services with any other party which would in any way prevent it from providing the Services contemplated under this Master Agreement to GALDERMA.

**12.0   Publication**.  DHC and its employees, consultants, contractors, agents, persons under contract or associated with DHC or any other third party performing Services under this Master Agreement shall not have the right to publish, in whole or in part, the results of a Project without GALDERMA's prior written consent.  Neither party will use the other party's name or artwork (for example, logo) in connection with any publication or promotion without the other party's prior written consent.

DHC shall not take (or permit a third party to take on its behalf) any of the following actions without GALDERMA's prior written approval, which approval may be withheld in GALDERMA's absolute discretion:   (i) make any information about GALDERMA or this Master Agreement available on the Internet; (ii) link any site on the Internet to any site on the Internet established, operated or sponsored by GALDERMA; or (iii) use any of GALDERMA's trademarks or tradenames on any site on the Internet.  In no event shall DHC establish, operate, sponsor or contribute content to any site on the Internet which incorporates any URL address established, operated, or sponsored by GALDERMA as its URL address or any part of such address.

**13.0   Software Integrity**.  DHC hereby represents and warrants that, to the best of its knowledge after a full and complete inquiry, its software will recognize and process date fields correctly after December 31, 1999, and perform all date-dependent calculations and operations (including sorting, comparing and reporting) correctly, and will not experience software ending and/or invalid and/or incorrect results as a result of the change of century or the occurrence of any particular date (all without human intervention, other than original data entry of valid dates).

**14.0   Indemnification**.  DHC shall indemnify, defend and hold harmless GALDERMA and its affiliates, its and their directors, officers, employees and agents (each, a "GALDERMA Indemnified Party"), from and against any and all losses, damages, liabilities, reasonable attorney fees, court costs, and expenses (collectively, "GALDERMA Losses") resulting or arising, from any third-party claims, actions, proceedings, investigations or litigation relating to or arising from or in connection with this Master Agreement, any Work Order, or the Services contemplated therein (including, without limitation, any GALDERMA Losses arising from or in connection with any study, test, device, product or potential product to which this Master Agreement or any Work Order relates), except to the extent such GALDERMA Losses are determined to have resulted from the negligence or intentional misconduct of DHC or from DHC's failure to conduct Services in compliance with all applicable laws, rules, and regulations.

GALDERMA shall indemnify, defend and hold harmless DHC and its affiliates, its and their directors, officers, employees and agents (each, a "DHC Indemnified Party"), from and against any and all losses, damages, liabilities, reasonable attorney fees, court costs, and expenses (collectively "DHC Losses") resulting or arising from any third-party claims, actions, proceedings, investigations or litigation relating to or arising from or in connection with this Master Agreement, any Work Order, or the Services contemplated herein (including, without limitation, any DHC Losses arising from or in connection with any study, test, device, product or potential product to which this Master Agreement or any Work Order relates), except to the

6

extent such DHC Losses are determined to have resulted from the negligence or intentional misconduct of a DHC Indemnified Party or from DHC's failure to conduct Services in compliance with all applicable laws, rules, and regulations. Notwithstanding anything contained herein, DHC may not extend its indemnification by GALDERMA hereunder to any Investigator, SMO, Institution or any other third party without the prior written consent of GALDERMA.

**15.0   Indemnification Procedure.**   The indemnitee shall give the indemnitor prompt notice of any such claim or lawsuit (including a copy thereof) served upon it and shall fully cooperate with and comply with all reasonable requests of the indemnitor and its legal representatives in the investigation of any matter the subject of indemnification. The indemnitee shall not negotiate, compromise or settle any Indemnitee Losses without indemnitor's prior written consent.

**16.0   Termination and Expiration.**

16.1   Termination. Except as otherwise provided, and notwithstanding the provisions of this Section 16.0, GALDERMA shall have the absolute and unconditional right, in its sole judgment and discretion, to terminate this Master Agreement or a Work Order hereunder without cause upon thirty (30) days advance written notice to DHC, and, in the event of such termination, upon receipt of such notice of termination, DHC shall perform pursuant to subsection 16.4(a).

16.2   Immediate Termination. Any Work Order executed pursuant to this Master Agreement may be terminated immediately by written notice from GALDERMA, if any of the following conditions occur:

(a)   Authorization and approval to perform a study described in a Work Order in the United States or elsewhere in the world is withdrawn by the FDA or other local authorities;

(b)   Animal, human or toxicological test results, in the opinion of GALDERMA, support termination of a study;

(c)   The emergence of any adverse event with any study drug administered in a study is of such magnitude or incidence, in the opinion of GALDERMA, to support termination;

(d)   DHC fails to comply with the terms of the relevant protocol or where DHC contracts or engages Investigators to perform a study, fails to ensure said Investigators' compliance with the relevant protocol; or

(e)   DHC or any of its employees, consultants, contractors, agents or any third party performing Services under this Master Agreement are debarred by the FDA pursuant to the Generic Drug Enforcement Act of 1992 (21 U.S.C. 301 et seq,) as amended from time to time.

16.3   Termination for Breach or Insolvency. In addition to any other rights or remedies contained herein, this Master Agreement or any Work Order may be terminated by either party:

(a)   On written notice effective immediately if the other party commits a material breach of this Master Agreement or a Work Order for which a cure is not

7

commenced within ten (10) days or which is not cured within thirty (30) days of receipt of written notice from the other party; or

(b)     Upon thirty (30) days written notice if the other party becomes insolvent, is dissolved or liquidated, makes a general assignment for the benefit of its creditors, files or has filed against it a petition for bankruptcy, or has a receiver appointed for a substantial part of its assets.

Notwithstanding 16.3(a) above, in the event DHC commits a material breach arising out of its failure to comply with any pertinent law or regulation as required under Section 10.0 above, GALDERMA may terminate a Work Order on written notice effective immediately.    In the event 16.3(a) or 16.3(b) occur, GALDERMA or DHC shall immediately notify the other, in writing, of its occurrence.

Upon termination pursuant to this subsection, the breaching party shall be required to perform according to the terms of subsection 16.4(a) (if DHC is the breaching party) and shall be entitled to be compensated, subject to an accounting and according to subsections 16.4(a) and 16.4(b) below, to the extent such responsibilities are not duplicative.

16.4    Effects of Termination

(a)     DHC Responsibilities.  In the event of termination of this Master Agreement or a Work Order, DHC shall: (i) exercise its termination rights under any existing Investigator agreement or assign such agreement to GALDERMA, at GALDERMA's option, and DHC agrees not to interfere with these efforts and to promptly provide GALDERMA with a list of all Investigators, and copies of all records required under this subsection; (ii) conduct close-out visits at the site(s) in order to conclude the applicable Project; (iii) perform any other monitoring Services necessary to discharge its responsibilities under 21 CRF part 312.52; (iv) perform such Services reasonably necessary or required in connection with the orderly wind-down of each Project or in connection with the performance of its obligations under the terms of this Master Agreement or by federal, state law or regulation, including applicable FDA guidelines; (v) promptly prepare and submit to GALDERMA a final financial report, and copies of all records, including but not limited to all financial records relating to each Project or its performance and all periodic reports and subject records; (vi) deliver to GALDERMA all data, statistical reports, all data entries, and any other documentation produced as a result of any and all Services performed by DHC; and (vii) return all data and materials provided by GALDERMA to DHC for the conduct of the Project within forty-five (45) days from date of closeout. GALDERMA shall not be obligated to make any final payments to DHC until such time as DHC has performed all of its obligations.  DHC shall cooperate with GALDERMA to provide for an orderly wind-down and termination of the Master Agreement or Work Order(s) as provided herein.

Upon DHC's receipt of GALDERMA's written notice of termination or noncommencement, DHC shall use best efforts to minimize any costs incurred, to avoid incurring any additional costs, and shall refrain from enlisting any additional Investigators or subjects.  In the event of early termination under this Section, DHC shall promptly return to GALDERMA any prepaid unearned

funds, including payments for Investigator costs except to the extent such payments are non-refundable or non-cancelable, where DHC contracts or engages Investigator(s), contractor(s) or consultant(s) to perform a Project, effective as of the date of termination.

In the event this Master Agreement or any Work Order hereunder is terminated, DHC reserves the right to retain one copy of all materials provided to GALDERMA as the result of Services performed by DHC under the affected Project(s) as is reasonably necessary for regulatory, insurance, or business purposes, for a period up to ten (10) years, which will remain subject to the confidentiality provisions herein, to be used only if a dispute arises regarding the Services performed by DHC hereunder. At the end of the retention period, DHC will, at the sole expense and direction of GALDERMA, either return or dispose of all such materials and provide GALDERMA with written documentation of the time and method of destruction.

(b)    <u>GALDERMA Responsibilities</u>. In the event of termination of this Master Agreement or Work Order(s), GALDERMA shall pay DHC in accordance with the terms of the applicable Work Order(s): (i) the amounts due DHC, if any, for all work and Services performed or committed to through the effective date of termination; (ii) the amounts due DHC, if any, for reimbursement expenses incurred by DHC in performing Services during the notice period; (iii) all reasonable non-refundable or non-cancelable costs incurred by DHC in terminating its activities provided such costs were incurred prior to termination or result from obligations incurred prior to termination; and (iv) all actual costs, including time spent by DHC personnel (which shall be billed at DHC's rates referenced in the relevant Work Order(s)), incurred to complete activities associated with the termination and close out of the affected Project(s), including the fulfillment of any regulatory requirements.

16.5    In addition to the tasks to be performed by DHC pursuant to subsection 16.4(a) above, as soon as practicable following receipt of cancellation notice from GALDERMA, DHC will submit an itemized accounting of costs incurred, costs anticipated, and payments received in order to determine a balance to be paid by either party to the other. Such balance will be paid within thirty (30) days of GALDERMA's receipt of an invoice with final reconciliation. Upon GALDERMA's receipt of a final invoice and GALDERMA's payment thereof, GALDERMA shall have no further obligation for compensation under the relevant Work Order(s). Such final invoice shall be submitted to GALDERMA, no later than forty-five (45) days after the final closeout of the Project. No invoices for the relevant terminated Work Order(s) will be accepted after this forty-five (45) day period.

16.6    Any Work Order executed before termination of this Master Agreement shall continue to be governed by this Master Agreement unless the parties determine otherwise or the Work Order is also terminated.

17.0    **Cooperation**. All data and information in GALDERMA's possession or control necessary for DHC to conduct Project assignments will be forwarded by GALDERMA to DHC. DHC shall not be liable to GALDERMA nor be deemed to have breached this Master Agreement or any Work Order for errors, delays or other consequences arising from GALDERMA's failure to provide documents, materials or information or to otherwise cooperate with DHC in order for DHC to timely and properly perform its obligations.

9

**18.0   Force Majeure and Delays.**   In the event either party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reasons of strike, lockouts, labor troubles, inability to procure materials, failure of power or restrictive government or judicial orders, or decrees, riots, insurrection, war, Acts of God, inclement weather or other similar reason or cause beyond that party's control (not including the inability of a party's software to perform date-dependent calculations properly), then performance of such act shall be excused for the period of such delay; provided, however, if such delay continues in excess of four (4) weeks, either party may terminate the effected Work Order(s).

**19.0   Notices.**   Any notice required or permitted to be given hereunder by either party hereunder shall be in writing and shall be deemed given on the date received if delivered personally or by reputable overnight delivery service, or three (3) days after the date postmarked if sent by registered or certified mail, return receipt requested, postage prepaid to the following addresses:

| | |
|---|---|
| If to GALDERMA: | If to DHC: |
| Galderma Laboratories, L.P. | Dimensional HealthCare, Inc. |
| ATTN: Legal Services | ATTN: Michael Morales |
| 14501 North Freeway | 240 Cedar Knolls Road, Suite 101 |
| Ft. Worth, TX 76177 | Cedar Knolls, NJ 07927 |
| | |
| Phone: (817) 961-5000 | Phone: (973) 734-0990 |
| Fax: (817) 961-0034 | Fax: (973) 734-9977 |

**20.0   Insurance.**   During the term of this Master Agreement, DHC shall procure and maintain Comprehensive General Liability insurance, which shall include blanket broad form contractual liability coverage, with limits of not less than $1,000,000 per occurrence for bodily injury and property damage, combined single limit.   DHC shall also procure and maintain Worker's Compensation insurance in accordance with relevant state statutory limits, Employer's Liability insurance with a limit of not less than $500,000 per occurrence, Automobile liability insurance covering all owned, hired and non-owned automobile equipment with limits of not less than $1,000,000 per occurrence for bodily injury and property damage, combined single limit, Professional Liability insurance (Errors & Omissions) with a limit of not less than $1,000,000 annual aggregate and Excess Liability or Umbrella insurance with a limit of not less than $1,000,000 annual aggregate. DHC shall, at GALDERMA's request, provide GALDERMA with certificate(s) of insurance evidencing any such coverage described in this paragraph. DHC shall require all of its subcontractors retained in connection with this Master Agreement, if any, to provide the aforementioned coverages as well as any other coverages DHC may consider necessary.

**21.0   Assignment.**   Neither party may assign any of its rights or obligations under this Master Agreement to any party without the express written consent of the other party; provided, however, that GALDERMA may assign this Master Agreement and any Work Orders without the consent of DHC to a third party who acquires control of all or substantially all of the relevant business of GALDERMA.

**22.0   Audits.**   During the term of this Master Agreement, DHC will permit GALDERMA's representatives to examine or audit the work performed hereunder and the facilities or sites where the Services are provided upon reasonable advance notice and during regular business hours to determine that the Services are being conducted in accordance with the applicable Work Order and that the facilities and personnel are adequate.   If any audit, inspection, or other

10

regulatory action reveals a deficiency in DHC's performance of Services that causes all or any part of the Project pursuant to a Work Order to be invalid or nonconforming to the standards set forth in the applicable Work Order as determined by GALDERMA, in its reasonable discretion, or unacceptable to regulatory agencies worldwide, DHC shall, at GALDERMA's sole discretion, either (i) immediately repeat the deficient Services at DHC's sole cost, or (ii) refund to GALDERMA the costs paid for such deficient Services upon written notification from GALDERMA to terminate the relevant Work Order or Project.

**23.0   Insider Trading.**  DHC hereby acknowledges that it is aware that the United States and other applicable securities laws prohibit any person who has material, non-public information about a company from purchasing or selling securities of such company or from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.  DHC agrees to make its employees, consultants, agents, subcontractors, or any other third-party person performing Services under this Master Agreement aware of such securities laws and their need to comply with such laws.

**24.0   Construction and Survival.**  This Master Agreement shall be construed, governed, interpreted, and applied in accordance with the laws of the State of New York exclusive of its conflicts of laws provisions.  The failure to enforce any right or provision herein shall not constitute a waiver of that right or provision.  If any provisions herein are found to be unenforceable on the grounds that they are overly broad or in conflict with applicable laws, it is the intent of the parties that such provisions be replaced, reformed or narrowed so that their original business purpose can be accomplished to the extent permitted by law, and that the remaining provisions shall not in any way be affected or impaired thereby.  The rights and obligations of GALDERMA and DHC which by intent or meaning have validity beyond such termination or expiration (including, but not limited to, rights with respect to product-related inventions, confidentiality, discoveries and improvements, indemnification and liability limitations) shall survive the termination or expiration of this Master Agreement or any Work Order.

**25.0   Entire Agreement and Modification.**  This Master Agreement contains the entire understandings of the parties with respect to the subject matter herein and supersedes all previous agreements (oral and written), negotiations and discussions including the Master Clinical Services Agreement between the parties dated November 5, 2001.  The parties may modify any of the provisions hereof only by an instrument in writing duly executed by the parties.

**IN WITNESS WHEREOF,** the parties hereto have caused this Master Agreement to be executed in duplicate by their duly authorized representatives, effective as of the date of the last party to sign below.

**Galderma Laboratories, L.P.**                    **Dimensional HealthCare, Inc.**

By: _____                    By: _____

Name: _Dale Hooks_____                    Name: _MICHAEL J. MORALES_

Title: _Director, Marketing_                    Title: _PRESIDENT & C.E.O._

Date: _4-20-04_____                    Date: _FEBRUARY 19, 2004_

11

# EXHIBIT A

## *SAMPLE* WORK ORDER

This Work Order ("Work Order") is entered into by and between **Dimensional HealthCare, Inc.** ("DHC") and **Galderma Laboratories, L.P.** ("GALDERMA") and relates to the Agreement referred to below.

**A.**  GALDERMA and DHC have entered into a Master Services Agreement dated the ____ day of _____, 2004 and as may be amended from time to time (the "Master Agreement") which is incorporated herein by reference; and

**B.**  Pursuant to the Master Agreement, DHC has agreed to perform certain services in accordance with written work orders entered into from time to time describing such services.

The parties agree to the following:

**1.**  **Work Order.**  This document constitutes a "Work Order" under the Master Agreement and this Work Order and services contemplated herein are subject in all respects to the terms and provisions of the Master Agreement.

**2.**  **Scope of Work Protocol.**  Attached hereto and incorporated herein as a part of this Work Order is a Project description or protocol ("Project Description") identified as:

The Project Description shall also include any attachments and supplements thereto specifically referenced in the project description, and any amendments that are agreed to by the parties in writing.

DHC shall conduct the Services required by the Project Description and any amendments thereto.  Except as otherwise provided by this Work Order, DHC shall follow the procedures and methodology, and shall observe and comply with the schedules, specified in the project description and any amendments thereto.  In addition, DHC shall carry out the work described in the Project Description, and any amendments thereto, in accordance with the Master Agreement.

**3.**  **Time Line.** *{Insert starting and ending dates.}*

**4.**  **Project Budget / Fees and Expenses.**  See budget attached hereto as Exhibit **A.** *{Attach budget to this document.}*

**5.**  **Payment Terms and Payment Schedule.** *{Insert specific description of payment schedule, or you can attach it and refer to it in this section.}*  In any event, total payments under this Work Order shall not exceed US$*{Insert dollar amount}* without GALDERMA's prior written approval.

6.      **Project Manager.** {*Insert name of project manager for DHC.*}

7.     **Work Authorization.**  GALDERMA's execution and return of one copy of this Work Order and any attachments hereto shall constitute authorization for DHC to conduct the Project or services described herein and to proceed with the work for the same.

The parties have caused this Work Order to be executed under seal in duplicate by their duly authorized representatives, and entered into as of the date of the last party below to execute.

**Galderma Laboratories, L.P.**          **Dimensional HealthCare, Inc.**



By:_____      By:_____

Print:_____      Print:_____

Title:_____      Title:_____

Date Signed:_____      Date Signed: _____

13

## EXHIBIT B

<table>
<tr><td colspan="6"><em><strong>SAMPLE</strong></em><br><br><strong>CHANGE ORDER FORM</strong></td></tr>
<tr><td>Change Order Number:</td><td></td><td>Date:</td><td colspan="3"></td></tr>
<tr><td>Client: DHC</td><td></td><td>Project Name:</td><td colspan="3"></td></tr>
<tr><td>Client Contact requesting modification:</td><td></td><td>Protocol Number(s):</td><td colspan="3"></td></tr>
<tr><td>Date of Client request to modify contract:</td><td></td><td>Does this change the overall timeline?</td><td>YES</td><td>NO</td></tr>
<tr><td>Revised Cost:</td><td></td><td></td><td></td><td></td></tr>
<tr><td colspan="6">Description of Modification:<br><br><br><br><br><br></td></tr>
</table>

*AGREED TO, ACKNOWLEDGED, AND ACCEPTED BY:*

The parties have caused this Change Order to be executed under seal in duplicate by their duly authorized representatives, and entered into as of the date of the last party below to execute.

**GALDERMA LABORATORIES, L.P.**        **Dimensional HealthCare, Inc.**

By:_____        By: _____

Print:_____        Print: _____

Title:_____        Title: _____

Date Signed:_____        Date Signed: _____

14

**EXHIBIT C**

**THIRD PARTY ACKNOWLEDGEMENT**

I, _____, have read and understand the terms of the Master Services Agreement between Dimensional HealthCare, Inc. and Galderma Laboratories, L.P., dated as of [INSERT EFFECTIVE DATE OF AGREEMENT] and I hereby agree to abide by and act in accordance with the terms and conditions thereof and I will not act in any way which would contravene such terms and conditions.

_____

Name:

15

ORIGINAL

JS 44 (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)   PLAINTIFFS | DEFENDANTS |
|---|---|
| GALDERMA LABORATORIES, L.P. | DIMENSIONAL HEALTHCARE, INC., MICHAEL J. MORALES and AQUENT, INC. |

2006 NOV 20  PM 3: 39

CLERK OF COURT

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___MORRIS COUNTY, NJ___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stephen M. Pezanosky, Josh Borsellino - Haynes and Boone, LLP
201 Main Street, Fort Worth, TX 76102

Attorneys (If Known)

4 - 0 6 C V - 8 2 2 - Y

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
　　　Plaintiff

☐ 3   Federal Question
　　　(U.S. Government Not a Party)

☐ 2   U.S. Government
　　　Defendant

☒ 4   Diversity
　　　(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)　　　　　　　　　　and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | 　　Med. Malpractice | ☐ 625 Drug Related Seizure | 　　28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | 　　Liability | ☐ 365 Personal Injury - | 　　of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | 　　Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| 　　& Enforcement of Judgment | 　　Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | 　　Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | 　　Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | 　　Liability | 　　Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| 　　Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | 　　Safety/Health | | ☐ 490 Cable/Sat TV |
| 　　(Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | 　　Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| 　　of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 　　Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | 　　Property Damage | 　　Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | 　　Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 　　12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | 　　Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | 　　Injury | | 　　& Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | 　　Sentence | ☐ 791 Empl. Ret. Inc. | 　　or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | 　　Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | 　　Accommodations | ☐ 530 General | | 　　26 USC 7609 | 　　Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | 　　Under Equal Access |
| | 　　Employment | ☐ 550 Civil Rights | | | 　　to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | 　　Other | | | | 　　State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original
　　Proceeding

☐ 2   Removed from
　　State Court

☐ 3   Remanded from
　　Appellate Court

☐ 4   Reinstated or
　　Reopened

☐ 5   Transferred from
　　another district
　　(specify)

☐ 6   Multidistrict
　　Litigation

☐ 7   Appeal to District
　　Judge from
　　Magistrate
　　Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: 28 U.S.C. 1332 Breach of contract, fraud and declaratory judgment

## VII. REQUESTED IN
## 　　COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
　　UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:　☐ Yes　☒ No

## VIII. RELATED CASE(S)
## 　　PENDING OR CLOSED

(See instructions):
JUDGE _____

DOCKET NUMBER _____

DATE

11/20/2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # FW001823　AMOUNT 350　APPLYING IFP _____　JUDGE Y　MAG. JUDGE _____