IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GALDERMA LABORATORIES, L.P.  §
                             §
v.                           §    CIVIL ACTION NO.4:06-CV-822-Y
                             §
AQUENT, INC.                 §

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN
<u>PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Pending before the Court is plaintiff Galderma Laboratories, L.P. ("Galderma")'s Motion for Partial Summary Judgment (doc. #25). Also before the Court is defendant Aquent, Inc. ("Aquent")'s Motion for Summary Judgment (doc. #27). The Court concludes that the agreement at issue requires Galderma to pay only for third-party costs actually paid out by Dimensional Healthcare, Inc. ("DHC"), the party with which Galderma contracted and from which Aquent purchased certain accounts receivable. The Court also concludes that (1) a fact issue remains as to whether Galderma is entitled to an offset on the accounts held by Aquent and (2) Aquent owes Galderma no duty under the agreement at issue. Further, the Court concludes that a fact issue remains as to Galderma's unjust-enrichment claim but that its quantum-meruit claim fails as a matter of law. Finally, the Court concludes that Galderma is not entitled to recover attorneys' fees on its breach-of-contract claim and that a ruling regarding attorneys' fees based on its other claims would be premature. As a result, the Court will grant in part and deny in part Galderma's motion for

partial summary judgment and will grant in part and deny in part Aquent's motion for summary judgment.

I.   Background

Galderma is a Texas pharmaceutical company that develops skin-care products. (Counterclaim at 1, ¶1; Amend. Comp. at 3, ¶8.)  DHC is a New Jersey Corporation that manages clinical trials for other companies.  (Amend. Comp. at 1, ¶2; Counterclaim at 1, 2, ¶¶2, 7.)  Michael Morales is the president and owner of DHC. (Amend. Comp. at 3, ¶3; Counterclaim at 2, ¶7.)  In late February 2004, Galderma and DHC entered into an agreement obligating DHC to manage clinical trials for Galderma. (Counterclaim at 2, ¶8.)  DHC was to sign up third-party providers (e.g., physicians) that would provide data for clinical trials. (Pltf. Mtn. App. at 96-97, Morales Depo. 26:23-27:4.)

In making arrangements with third-party providers and conducting the trials for Galderma, DHC would incur various costs, fees, and expenses.  (Pltf. Mtn. App. at 115, Morales Depo. at 50:20-24.)  Under the Agreement, DHC was responsible for paying these expenses but was to be reimbursed by Galderma. (Pltf. Mtn. App. at 98, Morales Depo. at 28:7-14.)

In October 2006, Galderma received an email from Morales informing Galderma that DHC was "experiencing a financial problem that has escalated over the past couple months." (Pltf. App. at

178-79.) The email also informed Galderma that DHC had uncovered a large amount of over-reporting of payments to third-party providers and that DHC was in the process of reconciling payments made in order to provide accurate reports to Galderma. In his deposition, Morales explained that his emailed reference to over-reporting meant that DHC had reported that it had sent out payments to third-party providers when, in fact, it had not. (Pltf. Mtn. App. at 139, Morales Depo. at 82:2-12.)

Concerned about the over-reporting, Galderma exercised its right under the Agreement to audit DHC's accounting records. On November 8, 2008, Galderma's chief financial officer, Yon Choi; director of marketing promotions, Leticia Cole; and accounting manager, Alison Parker, visited DHC's headquarters. (Gal. App. at 175, Choi Dec. at ¶7.) Galderma alleges that the audit it performed revealed that DHC had claimed to have paid third-party providers and, in turn, to have invoiced Galderma for more than $1,000,000 that DHC had not actually paid; that over $400,000 in obligations to third-party providers for which DHC was responsible was overdue; and that Galderma had paid $362,878 to DHC that DHC had neither incurred nor paid out. (Pltf. Mtn. at 12.) These findings resulted in Galderma's claiming DHC owed it $736,275. (*Id.*)

Aquent is a finance company that purchases accounts receivable at a discount. (Amend. Comp. at 5, ¶16; Counterclaim at

3, ¶11.)  Although the parties are not in agreement as to the exact date, at some point between October 2005 and November 2006, Aquent purchased various accounts receivable from DHC, including some due from Galderma as reimbursement for DHC's payment of third-party expenses on behalf of Galderma. (Amend. Comp. at 5, ¶16; Counterclaim at 3, ¶12.)

While Galderma admits that in practice DHC invoiced and Galderma paid for third-party costs before such costs were actually paid out by DHC, Galderma contends that under the Agreement DHC was not entitled to reimbursement for costs until DHC had actually paid them out. (Pltf. Mtn. at 9.)  Aquent asserts that payment was due according to a schedule set out in the work order for a given project and such schedule applied regardless of DHC's actual payment to third-party providers. (Def. Resp. 2-85, 9-13.)  According to Aquent, Galderma's refusal to render payment on the accounts Aquent purchased from DHC is a breach of the Agreement and the work orders. (Counterclaim at 7, ¶¶33-36.)

Galderma filed this declaratory-judgment action on November 11, 2206.  In its amended complaint, Galderma contends that Aquent, as DHC's assignee, breached the Agreement by requesting compensation for third-party costs in the amount of $329,995 before payment in that amount had actually been made to third parties. (Amend. Comp. at 6-7, ¶¶21-28.)  Galderma also contends that it is entitled to recover the $329,995 based on quantum

meruit and unjust enrichment. (Amend. Comp. at 7, ¶¶29-36.) By order (doc. #42) dated August 29, 2008, Morales and DHC were dismissed as defendants. Thus, Galderma's claims against those parties are no longer before the Court. The August 29 order also dismissed Aquent's claims of fraud, unjust enrichment, negligent misrepresentation, and tortious interference with contract.

Both sides have filed a motion for summary judgment. Galderma seeks summary judgment on its declaratory-judgment claim, asking the Court to declare that the Agreement governs its duty to reimburse DHC and that such reimbursement is due only after DHC has made payment to a third-party provider. Galderma also seeks a declaration that, against any amount it is determined to owe Aquent on the accounts Aquent purchased from DHC, it is entitled to an offset for payments it erroneously made due to DHC's over-reporting. Finally, Galderma seeks summary judgment on Aquent's counterclaim of breach of contract, contending that Aquent has suffered no damage as it is not yet entitled to payment under the Agreement.

Aquent seeks summary judgment on Galderma's claims of breach of contract, unjust enrichment, and quantum meruit. As for breach of contract, Aquent argues that there is no privity between itself and Galderma. It also asserts that the document that actually governs Galderma's obligation to compensate DHC (and thus Aquent) is not before the Court. Aquent contends that Galderma has not

alleged or produced evidence of the sort of wrongful conduct necessary to support an unjust-enrichment claim. Finally, Aquent asserts that Galderma has not produced evidence that Galderma has rendered valuable service or materials to Aquent or that Aquent was on notice of Galderma's expectation that it would be recompensed by Aquent as is needed to support a claim for quantum meruit.

## II. Discussion

### A.   Legal Standards

#### 1.   Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c).   An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham."   *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001).   Facts are considered "material" if they "might affect the outcome of the suit under governing law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material.   *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).   Next, the Court must review the

evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence

set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

### 2. Declaratory Judgment Act

Under 28 U.S.C. § 2201, a party may bring an action in federal court seeking a declaration of "the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201. However, § 2201 "confers discretion on the courts [to grant declaratory relief] rather than an absolute right on a litigant [to such relief]." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). To determine the propriety of a declaratory judgment, a court must perform a two-part inquiry. *See Abbott Labs v. Gardener*, 387 U.S. 136, 149 (1967). The court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.*

B.   Evidentiary Issues

Aquent presents two objections to Galderma's summary-judgment evidence.   Aquent argues that the memorandum summarizing Galderma's findings in its November 2006 audit of DHC is inadmissible hearsay.   Galderma responds that the memorandum is admissible under Federal Rule of Evidence 803(6), the business-records exception.   In order to be admissible under the business-records exception, a document must meet the following "foundational elements":

> (a) That the document have been made 'at or near' the time of the matters recorded therein; (b) that the document have been prepared by, or from information transmitted by a person 'with knowledge of the matters recorded'; (c) that the person or persons who prepared the document have been engaged in preparing it, in some undertaking, enterprise or business which can fairly be termed a 'regularly conducted business activity'; (d) that it have been the 'regular practice' of that business activity to make documents of that nature; and (e) that the documents have been retained and kept in the course of that or some other regularly conducted business activity.

*Wilander v. McDermott Int'l, Inc.*, 887 F.3d 88, 91 (5th Cir. 1989); *see also* FED. R. EVID. 803(6).

The Court agrees with Aquent that it has not been sufficiently established that the memorandum was made or kept in the regular course of business as required by Rule 803(6).   Although in her deposition Choi states that the memorandum is the sort of record made and kept in the regular course of Galderma's business (Pltf. Mtn. App. At 176), the Court is unconvinced by her parroting of the

9

business-records predicate.  In fact, Galderma does not rely upon
Choi's declaration in any way while arguing that the memorandum is
admissible.

Instead, Galderma argues that the lack of regularity in
creating or maintaining a particular document is not by itself a
sufficient ground to hold such document inadmissible. (Pltf. Reply
at 8 (citing WEINSTEIN'S FEDERAL EVIDENCE).)  But regularity is
expressly required by the rule.  *See* FED. R. EVID. 803(6).  The
advisory committee notes do indicate that Rule 803(6) was an
attempt to alleviate the "tendency unduly to emphasize a
requirement of routineness and repetitiveness" that had existed
under previous statutes and model rules.  *See* FED. R. EVID. 803(6)
advisory committee's note.  Nevertheless, the advisory committee
points out that "[t]he element of unusual reliability of business
records is said variously to be supplied by systematic checking,
by regularity and continuity which produce habits of precision, by
actual experience of [a] business in relying upon them, or by a
duty to make an accurate record as part of a continuing job or
occupation." *Id.*  Indeed, even Weinstein's treatise acknowledges
that "[m]emoranda that are casual, isolated, or unique do not
qualify as business records."  5 JACK B. WEINSTEIN & MARGARET A. BERGER,
WEINSTEIN'S FEDERAL EVIDENCE § 803.08[2] (Joseph M. McLaughlin 2d ed.
1997).

The only other facts before the Court from which an inference

might be drawn that memoranda such as the one at issue are generated or kept by Galderma with any regularity is the fact that the audit that the memorandum memorializes was conducted pursuant to a clause within the Agreement. It might be inferred that if such clauses were regularly made part of Galderma's agreements with its business partners, then Galderma may in fact regularly perform audits or similar evaluations of its partners' financial status and memorialize such evaluations in memoranda. Galderma does not make this argument.

Galderma insists that Morales's deposition lends sufficient trustworthiness to the memorandum to except it from the hearsay rule. It is true that indicia of trustworthiness might justify a more liberal application of Rule 803(6)'s requirements. *See Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 376 (5th Cir. 2005). Even so, the Court is not free to ignore the fact that some regularity is required by the rule and that aside from Choi's unpersuasive declaration, Galderma has introduced no evidence demonstrating regularity with regard to the memorandum. As a result, the memorandum is not competent summary-judgment evidence and Aquent's motion to strike is GRANTED. *Wilander,* 887 F.2d at 92 (reversing district court's admission of document under Rule 803(6) due to the lack of evidence that the document was regularly made or kept).

Aquent also challenges the contents of Choi's declaration.

Choi's declaration states that "invoices sent by DHC to Galderma were inaccurate" and that "Galderma pre-paid DHC a substantial sum for several projects that were canceled." According to Aquent, Choi's declaration is deficient in that it does not provide sufficient facts to establish what is meant by "inaccurate" or "substantial sum."

"[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation omitted). That Galderma pre-paid a "substantial sum" is not a conclusion, but instead a characterization of the amount paid. The "conclusion" implied by Choi's statement is that Galderma made pre-payments, a fact that is otherwise supported by the record (Pltf. Mtn. App. at 169; Morales Depo. at 130:9-25), and that Aquent does not contest. Indeed, Aquent's theory of this case is that, under the relevant work orders, payments were made on a schedule without regard to whether DHC had actually made payments to third-party providers. (Def. Resp. at 11, ¶27.) Similarly, Choi's statement that DHC's invoices were "inaccurate" is supported by the record. (Pltf. Mtn. App. at 178-79 (Morales's email).) These statements by Choi are not, therefore, the kind of unsupported conclusory allegations that should be excluded. Aquent's motion to strike as to Choi's

12

statements is DENIED.

Finally, as to Choi's declaration, Aquent contends that Galderma is attempting to use Choi as an expert and that Choi's qualifications to testify regarding the audit have not been established. In the initial scheduling order governing this case, the Court ordered that Galderma's expert designation be made no later than January 30, 2008 (doc. #13). Galderma timely designated Choi as an expert. (*See* Pltf. Reply at 12.) Aquent failed to challenge this designation, under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) by the deadline set out in the scheduling order. Aquent has, therefore, waived its objection to Galderma's use of Choi. *See Rushing v. Kansas City Southern Ry.*, 185 F.3d 496 , 505-06 (5th Cir. 1999) ("Failure to object to expert testimony forfeits the objection, precluding full review on appeal. This rule applies equally to evidence offered to support or oppose summary judgment. . . . The proper method of attacking the evidence is by a motion to strike that contains specific objections.") (citations omitted); *see also Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) ("A *Daubert* objection not raised before trial may be rejected as untimely.").

Regardless, Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in *Daubert*, "charges trial courts to act as 'gate-keepers,' [and to] make a 'preliminary assessment

of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 592-93 (1993)). In performing this duty, the Court must focus on the expert's "principles and methodology." *Daubert*, 509 U.S. at 595. And while there is no objection to Choi's declaration properly before the Court, it is the burden of the proponent of an expert to establish that such expert's testimony is reliable. *See* FED. R. EVID. 104(a); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The methods used by Choi and the other Galderma employees in performing the audit are never explained in any meaningful way. Without some discussion as to Choi's methods, the Court is unable to ensure reliability in light of the factors articulated in *Daubert* and is unwilling to consider Choi's audit findings in deciding these motions for summary judgment.

Although Aquent does not expressly object or move to strike Morales's deposition, it does complain in its briefing that his deposition is "inconsistent and therefore inconclusive." (*See* Def. Resp. at 13, 16.) As noted by Galderma, the "inconsistencies" in Morales's deposition stem more from his uncertainty regarding the impact of DHC's assignment of a portion of its receivables to Aquent than from confusion regarding the underlying facts. Indeed,

14

when  asked to assume that Aquent had assumed precisely the same rights as DHC, Morales stated that Galderma "would probably have [an] offset." (Pltf. Mtn. App. at 166-67, Morales Depo. at 127:1-128:6.) Thus, to the extent Aquent's complaints about Morales's deposition could be taken as an objection or motion to strike, they are DENIED.  The Court, in considering the merits of the motions, will address as may be necessary any inconsistencies in Morales's deposition, as highlighted by the briefing, and evaluate their proper influence on the determination as to the presence of a genuine issue of material fact.

Finally, the Court notes that throughout its briefing, and particularly in regard to the evidentiary issues, Galderma refers to Aquent's pleadings in DHC and Morales's bankruptcy.  Galderma contends that the Court should treat Aquent's pleadings as judicial admissions.  "[F]actual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).  "But judicial admissions are not conclusive and binding in a separate case from the one in which the admissions were made." *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1143 (5th Cir. 1991).  And while other doctrines might reach Aquent's pleadings in the bankruptcy proceedings, these doctrines would not give such pleadings the preclusive or binding effect desired by Galderma.  *See Gray v. Beverly Enterprises-*

*Mississippi, Inc.*, 390 F.3d 400, 408 n.7 (5th Cir. 2004) (noting that a court may take judicial notice of the fact of proceedings in another court but may not judicially notice another court's findings of fact); *see also Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 1998) ("Judicial estoppel applies to protect the integrity of the courts--preventing a litigant from contradicting its previous, inconsistent position *when a court has adopted and relied on it.*") (emphasis added). Galderma has produced no evidence that Aquent's allegedly inconsistent position in bankruptcy court has been adopted and relied upon by that court. Thus, to the extent that Galderma seeks to have Aquent bound by its pleadings before the bankruptcy court in this case, this Court declines to do so.

### C. Analysis

#### 1. Contract Claims

A federal court sitting in diversity applies the substantive law of the state in which it sits. *See Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999). In regard to the breach-of-contract claims, however, both sides acknowledge that the Agreement is to be governed by New York law.[1] (Plt. Mtn. at 4; Def. Mtn. at 4,

---

[1] Despite this acknowledgment, the parties, quite perplexingly, largely brief the breach-of-contract claims in terms of Texas law, often leaving the Court without guidance as to the merits of their arguments under governing law.

n.15.; Def. Counterclaim App. at 11, ¶24.0 (Agreement's choice-of-law provision).)  Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; and (4) damages.  *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 561 (S.D.N.Y. 1985).

Given Galderma's argument that the Agreement alone defines its duty to reimburse and Aquent's opposing argument that, instead, the work orders govern, the Court must first determine which argument prevails.  Contract interpretation is a question of law decided by the court.  *See K. Bell & Assoc., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996).  Where there is more than one reasonable interpretation of the contract, the issue should be submitted to the trier of fact, but if the contract is unambiguous, a court must give effect to the contract as written.  *Id.*

Galderma argues that the plain language of the Agreement defines its obligation to pay DHC--and thus its assignee, Aquent--for third-party costs and expenses.  In support, Galderma points to sections 2.1 and 2.2, which provide:

> Galderma shall reimburse DHC for all reasonable and necessary expenses and pass-through costs, net of discounts, incurred in the performance of the Services subject to any amount limitation set forth in the Work Order.

> DHC will invoice Galderma monthly for the fees, expenses and pass-through costs relating to the Project.

(Pltf. Mtn. App. at 2.)  According to Galderma the use of the word

17

"reimburse" demonstrates that Aquent, as DHC's assignee, is entitled to payment only for amounts DHC actually paid out to third parties. In response to Galderma's motion for summary judgment, Aquent argues that Galderma's duty to make payments is defined by the work orders related to the accounts purchased by Aquent. Sections 1.1, 1.2, and 2.0 of the Agreement provide:

> Scope of Agreement. As a "master" form of contract, this Master Agreement allows the parties to contract for multiple projects through the issuance of multiple Work Orders (as discussed in subsection 1.2 below) without having to re-negotiate the basic terms and conditions contained herein.

> Work Orders. The specific details of each project or study under this Master Agreement (each "Project") shall be separately negotiated and specified in writing on terms and in a form acceptable to the parties (see attached A). Each Work Order will include, as appropriate, the Project description or Project protocol, scope of work, time line, budget and payment schedule. Each Work Order shall incorporate this Master Agreement by reference. This Master Agreement and such Work Order shall collectively, independent from other Work Orders, constitute the entire agreement for a Project. To the extent any terms or provisions of a Work Order conflict with the terms and provisions of this Master Agreement, the terms and provisions of this Master Agreement shall control, except to the extent that the applicable Work Order expressly and specifically states an intent to supersede the Master Agreement on a specific matter. Notwithstanding the foregoing, GALDERMA is not obligated to execute any Work Orders hereunder, and DHC shall not rely on this Master Agreement to incur any costs or obligations of any sort.

> Payment of Fees and Expenses. No billings or payments shall be made under this Master Agreement. GALDERMA will pay DHC for fees, expenses and pass-through costs in accordance with each Work Order. Unless otherwise agreed to in a particular Work Order, the following shall apply . . . .

(Def. Counterclaim App. at 1.) The Agreement then proceeds to section 2.1, recounted above.

Aquent further argues that the Agreement includes a sample work order, referred to in section 1.2 as exhibit A, which in turn includes a section entitled "Payment Terms and Payment Schedule." (Def. Resp. App. at 12-13.) Aquent contends that this portion of the work orders typically included terms and conditions of payment specific to a project and that it was also typical for DHC to invoice Galderma for expenses incurred but not yet paid out. (Def. Resp. at 4, 7.) Finally, Aquent makes this same basic argument in support of its counterclaim for breach of contract: payments were scheduled, and thus, governed by the relevant work orders and were to be made regardless of DHC's actual payment of costs and expenses.

As an initial matter, the Court concludes that the Agreement is not ambiguous. "Whether multiple writings should be construed as one agreement depends upon the intent of the parties." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52-53 (2d Cir. 1993). Section 1.2 states that "The specific details of each project or study under this Master Agreement (each "Project") shall be separately negotiated and specified in writing on terms and in a form acceptable to the parties" and then refers to the example work order. (Def. Counterclaim App. at 1.) The Agreement then provides "This Master Agreement *and such Work Order*

shall collectively, independent from other Work Orders, *constitute the entire agreement for a Project*." (*Id.* (emphasis added)). Finally, as to the specific issue of when Galderma must make payments, the Agreement states "Unless otherwise agreed to in a particular Work Order, the following shall apply . . . ." (*Id.*) The Agreement goes on to list various default rules, including sections 2.1 and 2.2. (Pltf. Mtn. App. at 2.) These provisions manifest the parties' intent that, as to any particular project, the Agreement will be supplemented by the related work order and that these two documents will be read together as constituting the entire agreement between DHC and Galderma as to that project.

The Court further concludes that section 2.1 is itself unambiguous. As the Court reasoned in denying Aquent's motion to dismiss, "[i]f one has not paid any costs or expenses, one has not incurred them . . . . And one cannot reimburse [i.e. repay or pay back] something that was never paid, incurred, or expended in the first place." (Doc. #12 at 13.) Aquent's briefing of the summary-judgment motions no longer attempts to contradict this logic. Instead, Aquent rests on its contention that the work orders relevant to the invoices it purchased govern Galderma's obligation to make payment. As to both Galderma's request for a declaratory judgment and Aquent's breach-of-contract counterclaim, the question thus becomes whether relevant work orders indeed displaced the default rules stated in the Agreement's section 2.1, as

contemplated by section 2.0.

Unfortunately, neither party has submitted any work orders for the Court's consideration. This is not for lack of discovery. The discovery deadline has passed in this case and neither party contends that a request for the work orders has been denied by the other side. This aside, Aquent contends Galderma's failure to produce the work orders is fatal to Galderma's claims because without them those claims are not supported by the necessary proof. Galderma responds that it has established that under section 2.1 it is only required to make payment after costs and expenses were actually paid out and that Aquent's arguments based on the work orders amounts to an affirmative defense, which would obligate Aquent to produce any relevant work orders.

At no point does Aquent address its failure to support its own breach-of-contract counterclaim by producing the work orders. Galderma moves for summary judgment against Aquent on that counterclaim. (Pltf. Mtn. at 25.) In its motion, Galderma insists that a breach-of-contract claim requires proof of damages but that Aquent cannot prove any because the Agreement requires Galderma to "reimburse" costs and expenses as opposed to prepaying them. (*Id.*) In response, Aquent contends that an issue of fact exists as to whether the work orders require advance payment. (Def. Resp. at 9-12.) This is not sufficient to stave off summary judgment against Aquent on its own breach-of-contract claim. *See Celotex Corp.*, 477

U.S. 323-25 (concluding that moving party need not produce evidence showing absence of fact issue with respect to issue on which the nonmovant bears the burden of proof). Because Aquent's claims are based wholly on the obligations allegedly created by the work orders and because Aquent has failed to produce these documents, its counterclaim fails as a matter of law. *See Bank PLC*, 619 F. Supp. at 561 (noting existence of a contract and damages as necessary elements of a breach-of-contract claim under New York law). Galderma's motion for summary judgment as to Aquent's breach-of-contract claim will be granted.

Galderma's motion for declaratory summary judgment also will be granted in part. Galderma seeks a declaration that it is only required to pay DHC, and thus Aquent, for third-party costs actually paid out by DHC. The Court has concluded that section 2.1 is unambiguous and creates such an obligation. And, although this default rule may be overridden by a work order under the Agreement and although Aquent contends that work orders do so override in this case, no work orders are before the Court. *See Liquid Air Corp.*, 37 F.3d at 1075 (noting unsubstantiated assertions are insufficient to prevent summary judgment). Based on the record, therefore, Galderma is only obligated to pay Aquent for costs and expenses actually paid out by DHC.

Galderma also seeks a declaration that any amounts it owes Aquent must be offset by the amounts it overpaid DHC due to DHC's

over-reporting. As a matter of New York law, an assignee takes its rights under the assignment subject to any defenses that could have been asserted against the assignor at the time of the assignment. *See, e.g., Roslyn Assocs. v. Mineola*, 443 N.Y.S.2d 424, 425 (N.Y. App. 1981). This rule of law would apply to Aquent's purchase of Galderma's accounts with DHC. In light of the Court's rulings on Galderma's summary-judgment evidence, however, Galderma has not produced competent evidence to support a declaration that it is entitled to an offset. Therefore, to this extent, Galderma's motion for summary judgment will be denied.

The Court now turns to Aquent's arguments for summary judgment as to Galderma's breach-of-contract claim. To recap, Aquent contends that it is not DHC's assignee and, therefore, is not in privity with Galderma. But assuming that Aquent is DHC's assignee, Aquent contends it enjoys DHC's right to payment only and did not take on DHC's obligations under the Agreement. Finally, Aquent claims that Galderma has produced insufficient proof in support of its claims by failing to produce the work orders.

Aquent's counterclaim concedes that it "is the assignee of [DHC's] rights with regard to the unpaid [DHC] invoices." (Counterclaim at 7, ¶34.) Under New York law, in the absence of an agreement to the contrary, an assignee does not assume an obligation to perform under a contract. *See Sillman v. Twentieth Century-Fox Film, Corp.*, 144 N.E.2d 387, 391 (N.Y. 1957); *Langel*

*v. Betz*, 250 N.E. 890, 891 (N.Y. 1928).  The assignee may, however, expressly or impliedly bind itself to perform the assignor's duties.  *Langel*, 164 N.E. at 891.  Galderma cites various cases discussing how an assignee may impliedly assume the assignor's obligations.  All of the cases cited are Texas cases and, therefore, inapposite to this claim as it is governed by New York law.

Nevertheless, New York law holds that in the absence of an express agreement, it is a "question of interpretation whether [the assignee] impliedly assumed such obligation." *Spivak v. Madison-54th Realty Co.*, 303 N.Y.S.2d 128, 133 (N.Y. Sup. Ct. 1969).  The New York rule is particularly strict, in that it "requires proof of the claimed assumption of duties by the assignee." *Id.* (citing *O'Connor-Sullivan v. Otto*, 127 N.Y.S.2d 373, 376 (N.Y. App. Div. 1954).  "[N]o promise of the assignee to assume the assignor's duties is to be inferred from the acceptance of an assignment of a bilateral contract, in the absence of circumstances surrounding the assignment itself which indicate a contrary intention." *Langel*, 164 N.E. at 892.  Thus, Galderma's argument that Aquent's right to be paid is so "entwined" with the obligations imposed by the Agreement as to imply assumption by Aquent must fail.  Aside from the fact that "entwinement" is a Texas-law theory, any entwinement is a result of the terms of the Agreement, rather than a circumstance of the assignment itself, as required by New York

24

law.

Galderma also argues that Aquent should be deemed to have assumed the Agreement's obligations because otherwise Aquent will be unjustly enriched. Again, without proof that Aquent assumed the Agreement's obligations, this argument fails under New York law. *Cf. Iselin-Jefferson Financial Co. v. Makel Textiles, Inc.*, 250 N.Y.S.2d 299, 300 (N.Y. App. Div. 1964) (concluding that plaintiff's only recourse was against the assignor, with whom it had contracted, where assignor had assigned plaintiff's account to a factor assignee and plaintiff later determined that assignor had provided defective goods and services). Galderma has not demonstrated any other circumstances surrounding the assignment that have been held sufficient to imply an assumption of obligation. *Cf. Conditioner Leasing Corp. v. Sternmor Realty Corp.* 213 N.E.2d 884, 885 (N.Y. 1966) (concluding that a purchaser of a building impliedly assumed the obligation under a lease agreement to pay rent for the building's air conditioning where the purchaser took the building with knowledge that back rent was due at the time of purchase). Aquent's motion for summary judgment as to Galderma's claim for breach of contract, therefore, will be granted.


2.  Galderma's Quantum-Meruit Claim

Galderma contends that Aquent received $329,995 from Galderma

25

despite its knowledge that payments were not due under the Agreement. It seeks to recover this amount under the theories of unjust enrichment and quantum meruit. Because these are independent of the Agreement, the Court looks to Texas law in evaluating their merit.

"Quantum meruit is an equitable remedy [that] does not arise out of a contract, but is independent of it." *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). It is generally required that no express agreement covering the goods or services at issue exists. *Id.* Additionally, "to recover under quantum meruit a claimant must prove that:

1) valuable services were rendered or materials furnished;

2) for the person sought to be charged;

3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by him;

4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged."

*Id.* Aquent contends that the $329,995 is neither "valuable service" nor "materials furnished" as required by the first element. Aquent also argues that it was unaware it was expected to do anything in return for the $329,995 payment.

Galderma responds that its payment of money constitutes "materials furnished." Yet Galderma does not cite a single case holding as much. Indeed, the very nature of a quantum-meruit claim

26

demonstrates it is not meant for the recovery of a payment of money. *See Davidson v. Clearman*, 391 S.W.2d 48 (Tex.1965) (defining quantum meruit as a "promise implied by law to pay for beneficial services rendered and knowingly accepted"); *also Cf. Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 318-19 (Tex. App.–Austin 1992, no writ) (distinguishing between restitution based on unjust enrichment and quantum meruit in suit seeking recovery of money tendered to defendant). Aquent's motion for summary judgment as to this claim, therefore, will be granted.

### 3. Galderma's Claim of Unjust Enrichment

Aquent also asserts that it is entitled to summary judgment on Galderma's claim of unjust enrichment. Texas courts allow recovery to prevent unjust enrichment based on the equitable principle that a party receiving benefits ought to return them where it would be unjust for the party to retain such benefits. *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex. App.-Corpus Christi 2006, pet denied).

Aquent insists that recovery for unjust enrichment is only permissible where there is proof of fraud, duress, or the taking of undue influence, *see Vortt Exploration Co.,* 787 S.W.2d at 944, and that Galderma has produced no evidence of such actions by Aquent. But, as noted by Galderma, Texas courts have held that restitution under a theory of unjust enrichment "is an appropriate

remedy in circumstances where the agreement contemplated is . . . not fully performed." *City of Harker Heights*, 830 S.W.2d at 319. Indeed, restitution based on unjust enrichment may be appropriate where the defendant has "passively received [a benefit] which it would be unconscionable to retain." *Villareal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.-San Antonio 2004, pet den.); *see also RDG Ltd. P'ship v. Gexa Corp.*, No. 14-04-00679-CV, 2005 Tex. App. LEXIS 3123, at *10-12 & n.2 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (discussing whether the Texas Supreme Court has foreclosed recovery for passive receipt of benefits).

The Court concludes an issue of fact remains as to this point. Aquent's arguments acknowledge that the starting point of Galderma's obligation to make payment is the Agreement, and, it contends, such obligation may be altered by work orders. Aquent, therefore, became aware of the terms of the Agreement at some point. And, as noted above, the Court has concluded that the Agreement is unambiguous in requiring Galderma to make payment only after third-party costs are actually paid out. Thus, indulging all inferences in favor of Galderma as the non-movant, the Court will deny Aquent's motion for summary judgment as to this claim. *See, e.g., Community Mut. Ins. Co. v. Owen*, 804 S.W.2d 602, 606 (Tex. App.-Houston [14th Dist.] 1991, writ denied) (holding that unjust enrichment claim was supported by passive receipt where the defendant had received insurance proceeds with knowledge such

proceeds were meant to pay medical bills and retained the proceeds even after learning the insurance company had paid the medical bills).

### 4.  Attorneys' Fees

Aquent has moved for summary judgment as to Galderma's claims for attorneys' fees.  Galderma bases its claims for attorneys' fees on 28 U.S.C. § 2202 and Tex. Civ. Prac. & Rem. Code § 38.001. Section 2202 "does not provide the requisite statutory authority for a district court to automatically award attorney's fees." *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988).  New York law governs Galderma's breach-of-contract claim and, therefore, Texas law on the recovery of attorney's fees is inapposite to this claim.  Moreover, the Court has announced its intent to grant summary judgment in favor of Aquent on Galderma's breach-of-contract claim.  Under either state's law a party must prevail in order to recover fees.  *See* TEX. CIV. PRAC. & REM CODE ANN. § 38.001; *see also Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989).  Consequently, the Court will grant Aquent's motion for summary judgment regarding attorneys' fees in relation to Galderma's claim for breach of contract.

As to Galderma's only remaining tort claim, unjust enrichment, it appears that Tex. Civ. Prac. & Rem. Code § 38.001 provides a basis for recovering attorneys fees regarding such claim.  *See*

*Weitzul Constr., Inc. v. Outdoor Environs*, 849 S.W.2d 359, 366 (Tex. App.--Dallas 1993, writ denied) ("A party may recover attorney's fees for claims arising out of contracts or quantum meruit."); *see also Vortt Exploration Co.,* 787 S.W.2d at 945 (characterizing quantum meruit as founded on unjust enrichment). As a result, Aquent's motion for summary judgment will be denied on this point.

## III. Conclusion

Accordingly, declaratory judgment is GRANTED in favor of Galderma regarding its obligation to pay for third-party costs and expenses and DENIED regarding its entitlement to an offset. Summary judgment is also GRANTED in favor of Galderma on Aquent's breach-of-contract claim. Aquent's motion for summary judgment regarding Galderma's breach-of-contract and quantum-meruit claims is GRANTED, and its motion as to attorneys' fees is GRANTED IN PART. Aquent's motion for summary judgment regarding Galderma's unjust-enrichment claim is, however, DENIED.

SIGNED February 27, 2009.

Terry R. Means

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE